**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

GARRETT WILSON,

Plaintiff,

and

KEVIN LINDSEY, *Commissioner of the Minnesota Department of Human Rights*,

Movant,

v.

CFMOTO POWERSPORTS, INC.,

Defendant.

Civil No. 15-3192 (JRT/JJK)

**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOVANT'S MOTION TO INTERVENE**

---

Debra S. Nolan, **GARY, WILLIAMS, PARENTI, WATSON & GARY, PLLC**, 221 S.E. Osceola Street, Stuart, FL 34994, and Christopher J. Kuhlman, **KUHLMAN LAW, PLLC**, 333 Washington Avenue North, Suite 335, Minneapolis, MN 55401**,** for plaintiff.

Nicholas M. Wenner and Boris Parker, **PARKER & WENNER**, 100 South Fifth Street, 2100 Fifth Street Towers, Minneapolis, MN 55402, for defendant.

Timothy S. Christensen and Jonathan D. Moler, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, St. Paul, MN 55101, for intervenor.

Plaintiff Garrett Wilson brings this wrongful termination action against Defendant CFMOTO Powersports, Inc. ("CFMOTO"), asserting claims for racially based employment discrimination under 42 U.S.C. § 1981, and racially based employment and

business discrimination under the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.08, subdiv. 2, and § 363A.17(3). Wilson alleges that CFMOTO hired him to be a sales representative for the southern region of the United States, but then subsequently fired him after learning that he was black. CFMOTO now moves to dismiss the action in its entirety. Additionally, Kevin Lindsey, Commissioner of the Minnesota Department Human Rights ("MDHR"), moves to intervene under Federal Rule of Civil Procedure 24(b)(2)(A) in order to assert claims against CFMOTO.

The Court will deny CFMOTO's motion to dismiss Wilson's § 1981 claim because Title VII's minimum-employee threshold does not apply to claims brought under § 1981 and Wilson has stated a plausible claim for relief. The Court will also deny CFMOTO's motion to dismiss the MHRA claims because Wilson has pleaded enough facts to establish that he worked in Minnesota and he has stated plausible claims for relief. Finally, the Court will grant Lindsey's motion to intervene because the motion satisfies Rule 24(b)(2)(A), Lindsey has stated plausible claims for relief, and Lindsey's intervention is not *per se* prejudicial.

## BACKGROUND

### I. FACTUAL BACKGROUND

For the purposes of this motion to dismiss, the Court takes Wilson's factual allegations as true. *Cormack v. Settle-Beshears*, 474 F.3d 528, 531 (8th Cir. 2007). Defendant CFMOTO is a Minnesota corporation that manufactures and sells mopeds and all-terrain vehicles ("ATVs"). (Am. Compl. ¶¶ 13, 20, Sept. 8, 2015, Docket No. 14.)

Although its principal place of business and main offices are located in Plymouth, Minnesota, CFMOTO employs "individuals throughout the United States who [are] responsible for selling its products within designated territories." (*Id.* ¶ 7.)

Plaintiff Wilson is a resident of Kentucky and is black. (*Id.* ¶ 4.) From 2006 until approximately May 2011, Wilson operated a business called Moped International, which sold mopeds, scooters, and accessories. (*Id.* ¶ 13.) At some point during that time period, Moped International became an approved CFMOTO dealer and sold mopeds manufactured by CFMOTO. (*Id.* ¶ 14.)

In early 2011, CFMOTO Operations Manager Faith Ahler contacted Wilson to inquire about his interest in becoming the company's South Regional Sales Manager. (*Id.* ¶ 16.) Wilson interviewed by phone with CFMOTO's then-CEO, Charles Chen. (*Id.* ¶ 17.) The parties executed a nondisclosure agreement and Wilson was subsequently hired effective June 1, 2011. (*Id.* ¶¶ 18-19, 22.) As a condition of employment, Chen informed Wilson that he would have to give up operational control of Moped International; Wilson complied with this condition. (*Id.* ¶¶ 20-21.)

Wilson's job duties included selling off-road ATVs in the southern United States. (*Id.* ¶ 20.) Wilson was advised that although he would work remotely from Kentucky, "he would regularly report to and interact with executive level employees of CFMOTO working out of its Plymouth, Minnesota office" and that "he would be required to attend training and other meetings in Minnesota." (*Id.* ¶¶ 23-24.) Wilson was to receive a "mixed compensation package including salary plus commission based on sales volume." (*Id.* ¶ 22.)

During his employment, Wilson communicated almost daily by phone or email with employees and supervisors at CFMOTO's Minnesota office regarding potential sales leads, status updates, instructions, tasks, and other information pertaining to his job.  (*Id.* ¶¶ 26-28.)  Shortly after being hired, Wilson also attended two separate training sessions in Minnesota.  (*Id.* ¶¶ 29, 36.)  The first training lasted approximately one week, and the second training lasted approximately two to four days.  (*Id.*)

Before Wilson came to Minnesota for the first training, some of CFMOTO's Minnesota employees, including Ahler and CFO Eric Fan, were unaware that he was black.  (*Id.* ¶¶ 30-31.)  Upon his arrival in Minnesota, Wilson met two black employees who worked in the company's warehouse/packaging department.  (*Id.* ¶ 32.)  These employees told Wilson "that they were shocked that the company hired a black person for a sales/marketing position" and "that seeing this gave [one of the employees] new hope about his own job with the company."  (*Id.*)

After the first training was over, Fan told Ahler "that an African-American should not have been hired to work in sales, and that [Wilson] would not be allowed to continue with [CFMOTO]."  (*Id.* ¶ 34.)  Ahler "opposed" Fan's comments because Wilson had more sales experience than the other four sales representatives (all of whom were Caucasian), customers and dealers liked Wilson, and Wilson's race did not affect his ability to do his job.  (*Id.* ¶ 35.)

When Wilson returned to Minnesota for the second training, he learned that he had not been invited to a national ATV "expo"; the other four sales representatives – all white – had attended the expo.  (*Id.* ¶¶ 40-41.)  After the second training was over, Glen

Wakefield, a fellow sales representative, told Ahler that "he did not believe an African-American would be able to sell CFMOTO . . . products." Wakefield then complained directly to CFMOTO's new CEO, Adam Tao,[1] telling Tao that Wilson "would not be able to sell CFMOTO [products] because black people did not buy mopeds and ATVs," "black people do not ride ATV's [sic], black people do not come to shows, and a black person cannot sell power sports in the South." (*Id.* ¶¶ 38, 43.)

On August 16, 2011, Wilson called Tao to ask why he was not invited to the national ATV expo. (*Id.* ¶ 42.) During that phone conversation, Tao fired Wilson. (*Id.*) After Wakefield learned of Wilson's termination, he told a fellow CFMOTO employee "that he believed he got Wilson fired because" of his complaint to Tao. (*Id.* ¶ 43.)

## II. PROCEDURAL BACKGROUND

On April 19, 2012, Wilson filed an administrative charge of race-based discrimination against CFMOTO with the MDHR. (Aff. of Abbey Bowe ("Bowe Aff."), Ex. 1, Nov. 12, 2015, Docket No. 28.) The MDHR investigated the charge and issued a probable cause determination approximately 24 months later, on April 14, 2014. (*Id.*, Ex. 2; *id.*, Ex. 5 at 9, ¶ 9.) The MDHR found probable cause that CFMOTO racially discriminated against Wilson in violation of the MHRA. (*Id.*, Ex. 2 at 5.) CFMOTO contested the determination, and, on March 20, 2015, the matter was vacated and remanded for further investigation. (*Id.*, Ex. 3; Aff. of Kevin Lindsey ¶ 2, Nov. 12, 2015,

[1] Tao replaced Chen as CEO at some point after Wilson was hired. (Am. Compl. ¶ 38.) CEO Tao worked out of CFMOTO's Plymouth, Minnesota office. (*Id.* ¶ 39.)

Docket No. 27.)  Around that time, Wilson filed an amended charge.  (Bowe Aff., Ex. 4; Aff. of Boris Parker ("Parker Aff."), Ex. 2 at 1, Nov. 3, 2015, Docket No. 24.)  Then, on June 3, 2015, the MDHR issued a second probable cause determination, affirming its first determination and again finding probable cause that CFMOTO engaged in race-based discrimination against Wilson in violation of the MHRA.  (Bowe Aff., Ex. 5 at 13; Parker Aff., Ex. 1 at 1.)

Wilson withdrew his charge before the MDHR in July 2015 and initiated this action on August 3, 2015.  (Compl., Aug. 3, 2015, Docket No. 1.)  Wilson then filed an amended complaint on September 8, 2015.  (Am. Compl.)  In the amended complaint, Wilson asserts the following claims against CFMOTO: (1) employment discrimination based on race in violation of 42 U.S.C. § 1981, (2) employment discrimination based on race in violation of § 363A.08, subdiv. 2 of the MHRA, and (3) business discrimination based on race in violation of § 363A.17(3) of the MHRA.  (*Id.* ¶¶ 44-56, 57-61.)  Wilson alleges that he was paid a lower salary than the other four white sales representatives, that he did not receive the same level of training and sales assistance, that he was excluded from the national ATV expo, and that he was eventually fired, all because of his race. (*Id.* ¶ 47.)

CFMOTO moves to dismiss the amended complaint in its entirety.  (Mot. to Dismiss, Aug. 24, 2015, Docket No. 7.)  Also, on October 27, 2015, Commissioner Lindsey of the MDHR filed a motion to intervene under Federal Rule of Civil Procedure 24(b)(2)(A) in order to assert claims against CFMOTO.  (Mot. to Intervene, October 27, 2015, Docket No. 19.)  The Court will resolve both motions in this Order.

## ANALYSIS

### I. MOTION TO DISMISS

#### A. Standard of Review

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *See, e.g.*, *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed. *Id.*

#### B. Section 1981 Claim

CFMOTO moves to dismiss Wilson's § 1831 claim on two grounds: (1) CFMOTO is not an "employer" for the purposes of § 1981 because it has less than

fifteen employees, and (2) Wilson's factual allegations fail to state a plausible claim for relief. The Court rejects both arguments, and, accordingly, will deny the motion.

### 1. Minimum Employee Threshold

CFMOTO's initial argument, that Wilson's claim must be dismissed because CFMOTO is not an "employer" under § 1981, is premised on the following logic: First, CFMOTO argues that an employee cannot bring a Title VII claim against his or her employer unless the employer "has fifteen or more employees." 42 U.S.C. § 2000e(b). Second, CFMOTO asserts that employment discrimination claims under § 1981 and Title VII are subject to the same legal analysis. Third, CFMOTO argues that it has less than fifteen employees, thereby precluding Wilson's § 1981 claim.

This argument, although facially persuasive, does not have support in the law. The clear language of Title VII provides that the fifteen-employee threshold only applies "[f]or the purposes of **this** subchapter." *Id.* (emphasis added). Section 1981 is in a different subchapter, § 1981 itself contains no employee threshold, and CFMOTO has cited no authority to link the Title VII requirement to § 1981.[2] Additionally, while it is

[2] CFMOTO cites several out of circuit cases for the proposition that Title VII's fifteen-employee threshold also applies to claims brought under § 1981. The Court, however, finds that all of these cases are inapposite. Two of the cited cases do not involve § 1981 claims. *Davis v. Team Elec. Co.*, 520 F.3d 1080 (9th Cir. 2008); *De Jesus v. LTT Card Servs., Inc.*, 474 F.3d 16 (1st Cir. 2007). In three of the cases, the court does not even specifically reference, let alone discuss, the fifteen-employee threshold. *Harrington v. Harris*, 118 F.3d 359 (5th Cir. 1997); *Spaulding v. NW Hosp. Inv. Co.*, 209 F. Supp. 2d 1149 (D. Kan. 2002); *Lewis v. Philip Morris, Inc.*, 419 F. Supp. 345 (E.D. Va. 1976), *vacated sub nom. Lewis v. Tobacco Workers' Int'l Union*, 577 F.2d 1135 (4th Cir. 1978). The only § 1981 case that does reference Title VII's fifteen-employee threshold is *Richard v. Bell Atlantic Corp.*, 946 F. Supp. 54 (D.D.C. 1996).

(Footnote continued on next page.)

true that employment discrimination claims under § 1981 and Title VII share common prima facie elements,[3] the Supreme Court has recognized that § 1981 claims are not subject to the same procedural and administrative requirements as Title VII claims. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454-55 (2008); *Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989). The Supreme Court has even acknowledged, albeit in dicta, that "in the employment context, § 1981's coverage is broader than Title VII's, for Title VII applies only to employers with 15 or more employees whereas § 1981 has no such limitation." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 304 n.3 (1994) (citation omitted); *see also Patterson*, 491 U.S. at 211 (Brennan, J., dissenting) ("[Section] 1981 and Title VII are quite different. . . . Perhaps most important, § 1981 is not limited in scope to employment discrimination by businesses with 15 or more employees and hence may reach the nearly 15% of the workforce not covered by Title VII." (citation omitted)). Accordingly, the Court finds that Title VII's fifteen-employee threshold does not apply to claims brought under § 1981.

(Footnote continued.)

But that case is distinguishable. In *Richard*, the court did state that the test for determining whether a defendant is an employer under § 1981 "appears to be the same" as under Title VII. *Id.* at 61 n.2. The court then quoted § 2000e(b) of Title VII, including the fifteen-employee threshold language. *Id.* at 61. However, that passing statement and quotation were made in the context of the court's broader holding that a plaintiff could be considered an employee of both a subsidiary corporation and its parent. *Id.* at 61-67. The court never discussed, addressed, or decided whether the fifteen-employee threshold applies to § 1981 claims.

[3] "Claims under Title VII and § 1981 are analyzed under the same standards." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 873 n.2 (8th Cir. 2010)).

**2. Failure to State a Claim**

CFMOTO next argues that Wilson has failed to plead facts sufficient to support his § 1981 claim. The Court, however, finds this argument to be unavailing.

On a motion to dismiss, "[c]ivil rights pleadings are construed liberally. However, they must not be conclusory and must set forth facts which state a claim as a matter of law." *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993) (citing *Nickens v. White*, 536 F.2d 802, 803 (8th Cir. 1976)). A plaintiff can state a claim for § 1981 employment discrimination based either on disparate treatment or direct evidence. To state a claim based on disparate treatment, the plaintiff must allege that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) there are circumstances giving rise to an inference of discrimination. *See Green v. Franklin Nat. Bank of Minneapolis*, 459 F.3d 903, 913 (8th Cir. 2006) (citing *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850 (8th Cir. 2005)). A plaintiff can satisfy the fourth element – inference of discrimination – by alleging that "similarly-situated employees, who are not black, were treated differently." *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004).

To state a claim based on "direct evidence," the plaintiff must allege "that an illegitimate criterion was a motivating factor in an adverse employment action, even though other factors also motivated the action." *Browning v. President Riverboat Casino-Mo., Inc.*, 139 F.3d 631, 634 (8th Cir. 1998) (citing *Deneen v. Nw. Airlines, Inc.*, 132 F.3d 431, 435-36 (8th Cir. 1998)). "'Direct evidence' has been interpreted as

'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the employer's decision.'" *Id.* at 634-35 (alteration in original) (quoting *Thomas v. First Nat'l Bank*, 111 F.3d 64, 66 (8th Cir. 1997)). However, "[n]ot all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision." *Id.* at 635 (quoting *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 449 (8th Cir. 1993). "For example, 'direct evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'" *Id.* (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)).

Here, Wilson has pleaded facts sufficient to state a claim for relief under both theories. With regard to disparate treatment, Wilson first alleges that he is a member of a protected class. (Am. Compl. ¶ 4 ("Plaintiff . . . is an African-American male . . . .").) Second, the amended complaint contains multiple facts showing that Wilson was qualified to be CFMOTO's "South Regional Sales Manager." Wilson alleges that, prior to joining CFMOTO, he operated a moped/scooter business in a southern city, Lexington, Kentucky; he was an "approved CFMOTO POWERSPORT Dealer"; he already "sold mopeds manufactured by the Defendant"; he was specifically recruited to join CFMOTO; he "had more sales experience than any other person with the Company"; and he was liked by CFMOTO dealers and customers. (*Id.* ¶¶ 12, 14, 16, 35.) Third, Wilson alleges that he suffered an adverse employment action – he was fired. Fourth, he alleges facts

giving rise to an inference of discrimination, including that CFMOTO's Minnesota employees did not learn that he was black until after he was hired[4] and that similarly situated employees who were not black were treated differently. According to Wilson, he was paid less than the other four white sales representatives, his white colleagues were sent to the national ATV expo while he was not, he did not receive comparable training and sales assistance, and he was the only sales representative to be fired. (*Id.* ¶¶ 40, 47.) CFMOTO argues that these allegations lack factual support, are conclusory, and do not state a claim for relief. The Court, however, is not persuaded, because civil rights pleadings must be construed liberally, and Wilson's factual allegations plausibly suggest disparate treatment.

Wilson's allegations also state a plausible claim for relief based on direct evidence. Wilson points to specific statements by CFMOTO employees which indicate that race – an illegitimate criterion – was more likely than not a motivating factor in his

[4] CFMOTO offers an affidavit from one of its sales representatives purporting to show that several CFMOTO employees knew that Wilson was black before he was hired. (Aff. of Boris Parker ("Parker Aff."), Ex. B at 10 ¶¶ 4-6, Aug. 24, 2015, Docket No. 11). According to the affidavit, Wilson attended a CFMOTO sales meeting in Texas several weeks prior to his alleged start date. (*Id.*) CFMOTO contends that this affidavit proves that Wilson's discrimination allegations are false. The Court, however, will not consider the affidavit because on a motion to dismiss for lack of standing, the Court accepts "as true all factual allegations in the complaint" and "generally must ignore materials outside the pleadings." *Wieland v. U.S. Dep't of Health & Human Servs.*, 793 F.3d 949, 953 (8th Cir. 2015). And even if the Court were to consider the affidavit, it would neither undermine nor affect the viability of Wilson's claims. A close reading of the amended complaint reveals that Wilson has not actually alleged that **no** CFMOTO employees knew that he was black. Instead, Wilson merely asserts that CFMOTO's "Minnesota employees," including Fan and Ahler, were unaware of his race. (Am. Compl. ¶¶ 30-31.) Certainly, if it becomes apparent during discovery that relevant CFMOTO employees knew that Wilson was black in advance of his hiring, Wilson's case may be impacted. But, for the purposes of this motion to dismiss, the Court need not consider or give any weight to a self-serving affidavit that does not actually conflict with the amended complaint.

termination. According to Wilson, (1) CFO Fan told Operations Manager Ahler that "an African-American should not have been hired to work in sales, and that [Wilson] would not be allowed to continue with [CFMOTO]"; (2) Sales Representative Wakefield told Ahler that Wilson should not have been hired because "black people did not buy mopeds and ATVs"; and (3) Wakefield complained to CEO Tao about Wilson's hiring on the grounds that "black people do not ride ATV's [sic], black people do not come to shows, and a black person cannot sell power sports in the South." (Am. Compl. ¶¶ 34, 38, 43.) Wilson also alleges that CFMOTO has a culture of discrimination. To support this allegation, Wilson cites comments made by two African-American employees who worked in CFMOTO's warehouse/packaging department, who allegedly told him "that they were shocked that the company hired a black person for a sales / marketing position." (*Id.* ¶ 32.) While this allegation, on its own, does not constitute direct evidence, it provides helpful context for the statements made by Fan and Wakefield.

CFMOTO argues that Wilson's allegations cannot constitute direct evidence because the comments by Fan and Wakefield were merely stray remarks by nondecisionmakers. The Court, however, is not persuaded. CFMOTO admits that it has less than fifteen employees. In a company of that size, the Court finds it entirely plausible that Fan, an executive-level employee, and Wakefield, an employee with the same job as Wilson, may have been involved in some capacity in the decisionmaking process that led to Wilson's firing. Moreover, even assuming that Wakefield was a nondecisionmaker, Wilson alleges that Wakefield complained to the company's main decisionmaker, CEO Tao, and that Wakefield told another employee that he believed this

complaint led to Wilson's firing. This allegation, at the motion to dismiss stage, undoubtedly supports Wilson's claim that he was fired because of his race. *See Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 551 (8th Cir. 2013) ("[A]n employer may be vicariously liable for an adverse employment action if one of its agents – other than the ultimate decision maker – is motivated by discriminatory animus and intentionally and proximately causes the action." (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)).

Altogether, the Court finds that Wilson has stated a plausible claim for relief under § 1981 based on disparate treatment and direct evidence.

**C. MHRA Claims**

CFMOTO also moves to dismiss Wilson's MHRA claims, arguing that (1) Wilson lacks standing to sue under the MHRA because he has not alleged that he resided or worked in Minnesota, and (2) Wilson's factual allegations fail to state a plausible claim for relief. Again, the Court rejects both arguments and will deny CFMOTO's motion to dismiss.

**1. Standing to Assert MHRA Claims**

Courts have generally found, and this Court agrees, that a plaintiff must either reside or work in Minnesota to have standing to assert claims under the MHRA.[5] The

[5] *See Longaker v. Boston Sci. Corp.*, 872 F. Supp. 2d 816, 819-20 (D. Minn. 2012), *aff'd*, 715 F.3d 658 (8th Cir. 2013); *Arnold v. Cargill, Inc.*, No. 01-2086, 2002 WL 1576141, at *2-4 (D. Minn. July 15, 2002); *MacNab v. Fortis, Inc.*, No. 01-1810, 2002 WL 534885, at *2

(Footnote continued on next page.)

basis for this rule comes from the language of the MHRA itself as well as the "general presumption . . . against extra-territorial application of a state's statute." *Longaker v. Boston Sci. Corp.*, 872 F. Supp. 2d 816, 819 (D. Minn. 2012) (citing *In re Pratt*, 18 N.W.2d 147, 153 (Minn. 1945)), *aff'd*, 715 F.3d 658 (8th Cir. 2013); *see also In re St. Paul & K.C. Grain Co.*, 94 N.W. 218, 225 (Minn. 1903) (applying the same presumption). Under the MHRA, the term "employee" for the purpose of an employment discrimination claim is defined as an individual "who resides or works **in this state**." Minn. Stat. § 363A.03, subdiv. 15 (emphasis added). The MHRA's "Declaration of Policy," which covers the entire statute, includes similar limiting language: "It is the public policy of this state to secure **for persons in this state,** freedom from discrimination . . . . Such discrimination threatens the rights and privileges of **the inhabitants of this state**." *Id.* § 363A.02, subdiv. 1(a), (b) (emphasis added). Furthermore, "[t]he MHRA contains no . . . specific provision extending the application of the statute to persons outside the borders of the state." *Arnold v. Cargill, Inc.*, No. 01-2086, 2002 WL 1576141, at *2 (D. Minn. July 15, 2002). This stands in contrast to other Minnesota statutes, such as the Worker's Compensation Act, which do explicitly provide for extraterritorial application. *See* Minn. Stat. § 176.041, subdiv. 2 (providing for extraterritorial application of the Worker's Compensation Act).

(Footnote continued.)

(D. Minn. Apr. 5, 2002); *cf. Harrington v. Nw. Airlines, Inc.*, No. A03-192, 2003 WL 22016032, at *2 n.1 (Minn. Ct. App. Aug. 26, 2003).

Because the parties do not dispute that Wilson resides in Kentucky, the standing issue in this case hinges on whether he "worked" in Minnesota.  CFMOTO argues that Wilson did not – he was, at most, a salesperson residing and working in Kentucky. Wilson, on the other hand, alleges that he worked in Minnesota because he spent between nine and eleven days in the state for training, his job would have required him to return to Minnesota for future trainings and meetings had he not been fired, he communicated with Minnesota employees by phone and email on a daily basis, all of his supervisors were located in Minnesota, and the discriminatory acts and statements occurred in Minnesota. While Wilson concedes that he spent the majority of his time in Kentucky, he asserts that his connections to Minnesota constitute working in the state.

Although it is a close call, the Court finds that Wilson has sufficiently alleged that he worked in Minnesota.  The Court makes this finding based on two factors.  First, the MHRA itself specifically provides that it "shall be construed liberally for the accomplishment of the purposes thereof."  *Id.* § 363A.04.  Based on this directive of liberal construction, the Court finds it entirely reasonable that the Minnesota legislature intended for the MHRA to protect an individual like Wilson, who, despite not working in Minnesota full-time, physically spent time in the state, was expected to return to the state for future trainings and meetings, reported to and communicated with Minnesota supervisors, and was discriminated against in the state.  To conclude otherwise would, in the Court's view, unreasonably restrict the intended reach and scope of the MHRA.

Second, the Court finds that the cases cited by CFMOTO, in which courts dismissed MHRA claims because the plaintiffs lacked standing, are distinguishable.  In

all of those cases, the plaintiffs spent no time in Minnesota and had only tangential or trivial connections to the state.[6]  Here, by comparison, Wilson alleges a clear physical presence in Minnesota as well as other direct, ongoing, and non-trivial connections to the state.   CFMOTO relies heavily on *Arnold v. Cargill* for the proposition that Wilson cannot have standing simply because CFMOTO's headquarters are located in Minnesota and the alleged discriminatory conduct "emanated" from Minnesota.  2002 WL 1576141, at *4.   The Court does not disagree – such factual allegations, on their own, are insufficient to establish MHRA standing.   But, Wilson does not rely solely on these two facts.   As outlined above, Wilson also asserts that he attended two in-state trainings, reported directly to and received instruction from Minnesota supervisors, communicated daily with Minnesota employees, and would have returned to the state for future trainings and meetings.   These allegations differentiate Wilson's claims from those that failed in *Arnold*.

In sum, the Court finds that Wilson has pleaded facts sufficient to survive CFMOTO's motion to dismiss on standing grounds.  It may be that evidence at trial or

---

[6] *See, e.g.*, *Longaker*, 872 F. Supp. 2d at 819-20 (dismissing an MHRA claim by a plaintiff whose **only** Minnesota connection was a clause in his employment agreement providing that Minnesota law would govern disputes and that Minnesota was the exclusive jurisdiction for disputes and claims); *Arnold*, 2002 WL 1576141, at *2-4 (dismissing MHRA claims by plaintiffs whose **only** Minnesota connections were that the defendant's headquarters were located in Minnesota and the discriminatory policies "emanated" from Minnesota); *MacNab*, 2002 WL 534885, at *2 (dismissing an MHRA claim by a plaintiff whose **only** Minnesota connection was that the company she worked for was a wholly owned subsidiary of a company that was a wholly owned subsidiary of a company that owned a Minnesota corporation); *Harrington*, 2003 WL 22016032, at *2 n.1 (acknowledging that the state district court dismissed the plaintiff's MHRA claim because the plaintiff did not reside in Minnesota and the alleged discriminatory act occurred in California).

exhibits submitted with a future summary judgment motion may bring Wilson's standing into question (by showing, for example, that he did not attend trainings in Minnesota, would not have attended future trainings and meetings in the state, or did not communicate daily with Minnesota employees).  *See Constitution Party of S. Dakota v. Nelson*, 639 F.3d 417, 420 (8th Cir. 2011) (holding that a plaintiff "must support each of the standing requirements with the same kind and degree of evidence at the successive stages of litigation as any other matter on which a plaintiff bears the burden of proof" (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  But for the purposes of this motion to dismiss, Wilson has done enough.

### D.    Failure to State a Claim

CFMOTO next argues that even if Wilson has standing to pursue his MHRA claims, he has failed to plead sufficient facts to support them.  The Court finds this argument unpersuasive as well.  Claims for employment discrimination and employment-related business discrimination under the MHRA are subject to the same general analysis as employment discrimination claims brought under § 1981.  *See Smith v. DataCard Corp.*, 9 F. Supp. 2d 1067, 1078-79 (D. Minn. 1998) ("In essence, the elements of a section 1981 claim in the employment setting are the same as those of disparate-treatment, race-discrimination claims under . . . MHRA."); *see also Kalema v. U.S. Oil Co.*, No. 05-0323, 2006 WL 2289849, at *2-3 (D. Minn. Aug. 8, 2006); *Gold Star Taxi & Transp. Serv. v. Mall of Am. Co.*, 987 F. Supp. 741, 745 (D. Minn. 1997).  Thus, for all of the same reasons that Wilson has stated a claim for relief under § 1981, the Court also

finds that Wilson has stated claims for relief under the MHRA: Wilson alleges he is member of a protected class, had a contractual employment relationship with CFMOTO and was qualified for the sales representative position, was fired, and was subjected to disparate treatment and race-based animus, as supported by the facts discussed above.

CFMOTO argues that Wilson's MHRA claims are nevertheless deficient because he has failed to allege that he was an employee for the purposes of the MHRA. This argument, however, lacks merit. The Court first notes that Wilson does not need to show that he is an "employee" for the purposes of his § 363A.17(3) claim. *See, e.g.*, *Boone v. PCL Const. Servs., Inc.*, No. 05-24, 2005 WL 1843354, at *1-4 (D. Minn. Aug. 2, 2005) (allowing independent contractors' MHRA claims to proceed). Second, although Wilson must show that he is an employee for purposes of his § 363A.08 claim, the facts alleged in the complaint, taken as true, suggest that he is. "Employee" is defined as "an individual who is employed by an employer and who resides or works in this state" and "includes a commission salesperson." Minn. Stat. § 363A.03, subdiv. 15. A commission salesperson, in turn, is someone "who is paid on the basis of commission sales and who . . . is an independent contractor." *Id.* § 181.145, subdiv. 1. Here, Wilson alleges multiple facts to plausibly show that he was an employee or commission salesperson as defined under the statute. He asserts that CFMOTO's then-CEO Chen "offered" him a position as South Regional Sales Manager; he "accepted the offer of employment and began working on June 1, 2011"; he was to receive "a mixed compensation package including salary plus commission based on sales volume"; his job duties included selling ATVs; he was to report to supervisors located in CFMOTO's Minnesota office; and that

he was ultimately fired.  (Am. Compl. ¶¶ 18-25, 42.)  And, as described above, Wilson has also sufficiently alleged that he worked in Minnesota.

CFMOTO finally argues that Wilson's § 363A.17(3) business discrimination claim is deficient because Wilson has not alleged a contractual relationship.  The Court, however, finds that he has.  Numerous facts in the amended complaint support the existence of an employment contract between Wilson and CFMOTO, including all of the allegations listed in the preceding paragraph concerning Wilson's status as an employee or commission salesperson.  CFMOTO focuses the majority of its argument on a non-disclosure agreement that Wilson attached as an exhibit to his amended complaint.  This agreement, according to CFMOTO, undercuts Wilson's business discrimination claim because it evidences, at most, a contractual relationship between CFMOTO and Wilson's business, Moped International, and not one between CFMOTO and Wilson.  *See Krueger v. Zeman Const. Co.*, 781 N.W.2d 858, 863-64 (Minn. 2010) (holding that a person who is not a party to a contract cannot maintain a claim for business discrimination regarding that contract).  But contrary to CFMOTO's argument, the non-disclosure agreement actually supports the existence of a contract between the parties.  CFMOTO and Wilson are unequivocally the sole parties to the agreement.  (Am. Compl., Ex. A at 1 ("THIS NONDISCLOSURE AGREEMENT . . . is . . . between CFMOTO Powersports, Inc., . . . and Garrett Wilson . . . .")).  And in the recitals section, the agreement notes that the parties "have or are entering into a business and/or employment relationship."  (*Id.*)  The agreement thus bolsters the already plausible inference that CFMOTO and Wilson had an

employment contract, the performance of which was affected by race-based discrimination.

Overall, the Court finds that Wilson has stated plausible claims for relief under the MHRA. Wilson must of course eventually substantiate his factual allegations or his claims will fail. For now, however, he has satisfied his pleading burden.

## II. MOTION TO INTERVENE[7]

The final issue is Commissioner Lindsey's motion to intervene. Lindsey seeks to intervene under Federal Rule of Civil Procedure 24(b)(2)(A), which provides that "[o]n a timely motion, the court may permit a . . . state governmental officer or agency to intervene if a party's claim or defense is based on . . . a statute or executive order administered by the officer or agency." To intervene under this rule, the "proposed intervenor [must] (1) file a timely motion, (2) be a federal or state governmental officer or agency, (3) administer the statute . . . at issue, and (4) not cause undue delay or prejudice to the original parties' rights, if allowed to (permissively) intervene." *Coffey v. C.I.R.*, 663 F.3d 947, 951 (8th Cir. 2011). In assessing whether a motion to intervene is timely, the Court, in its discretion, will "consider: (1) the extent the litigation has progressed at the time of the motion to intervene; (2) the prospective intervenor's

[7] At the hearing on this motion, CFMOTO argued that the Court should disregard Lindsey's reply brief because he filed it without seeking prior permission from the Court. *See* D. Minn. LR 7.1(b)(3) ("Except with the court's prior permission, a party must not file a reply memorandum in support of a nondispositive motion."). In the interest of having all facts and arguments before it, the Court will consider Lindsey's reply brief. However, the Court warns Lindsey that he **must** comply with all procedural requirements going forward.

knowledge of the litigation; (3) the reason for the delay in seeking intervention; and (4) whether the delay in seeking intervention may prejudice the existing parties." *ACLU of Minn. v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1094 (8th Cir. 2011). Finally, the proposed intervenor must have Article III standing. *See Coffey*, 663 F.3d at 950 ("Article III standing is a prerequisite for intervention in a federal lawsuit." (quoting *Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567, 570 (8th Cir. 1998)).

Pursuant to the above framework, the Court will grant Lindsey's motion to intervene. First, his motion was timely – it was filed less than three months after Wilson's amended complaint and before the start of discovery. Second, Lindsey is the Commissioner of the MDHR, a state government agency. Third, Wilson asserts claims under the MHRA, and Lindsey, in his capacity as Commissioner, administers the MHRA and has enforcement power. *See* Minn. Stat. §§ 363A.05, subdiv. 1, .06, subdiv. 1(8)-(10), .33, subdiv. 1, .33, subdiv. 5. Fourth, there is no indication that intervention would cause undue delay or prejudice to CFMOTO, because CFMOTO raises no specific argument concerning undue delay or prejudice, it must already defend itself against Wilson's claims, and Lindsey and Wilson's allegations involve the same operative facts. Finally, Lindsey has Article III standing – it is a basic proposition of our federal system that government officers granted the power of enforcing the law have standing to do so.

CFMOTO raises two arguments in opposition to Lindsey's motion, but both are unavailing. First, CFMOTO argues that Lindsey has no basis to intervene because its prospective complaint fails to state a claim upon which relief can be granted. However,

the Court is not persuaded – Lindsey's allegations are actually more detailed than Wilson's allegations. Thus, for all of the same reasons that Wilson's MHRA claims are sufficient, the Court also finds that Lindsey's claims are sufficient.

Second, CFMOTO argues that Lindsey's motion must be denied because its intervention in the case would be *per se* prejudicial. To support this argument, CFMOTO cites a Minnesota Supreme Court case, *State by Beaulieu v. RSJ, Inc.*, 552 N.W.2d 695 (Minn. 1996). In *Beaulieu*, an employee filed sex discrimination charges against her employer with the MDHR. *Id.* at 698. Although the MDHR is required by statute to make a probable cause determination within 12 months,[8] it did not do so until 31 months later. *Id.* at 699. The MDHR then filed an administrative complaint against the employer, and the employer moved to dismiss the complaint on the ground that the MDHR's probable cause determination was untimely. *Id.* The case ultimately reached the state supreme court, where the court made three holdings. First, the court held that "in all cases where the MDHR fails to make a determination of probable cause within 12 months after the filing of a charge, a respondent may seek appropriate relief from the administrative law judge. The relief granted . . . should be in proportion to the prejudice suffered by the respondent and may include dismissal of the complaint." *Id.* at 702-03.

[8] When *Beaulieu* was decided, a prior version of the MHRA was in effect. Although the statute was subsequently updated and re-codified, the provisions applicable to probable cause determinations and timeliness have not changed. *Compare* Minn. Stat. § 363.06, subdivs. 1-4 (1996), *with* Minn. Stat. § 363A.28, subdivs. 1-3, 6. Moreover, courts have continued to rely on *Beaulieu*. *See, e.g.*, *Powers-Potter v. Nash Finch Co.*, No. 14-0339, 2014 WL 2003063, at *1 (D. Minn. May 14, 2014), *reconsideration denied*, No. 14-0339, 2014 WL 2106300 (D. Minn. May 20, 2014).

Second, the court held "as a matter of law, that probable cause determinations made 31 or more months after a charge is filed are per se prejudicial to the respondent and require dismissal of the complaint." *Id.* at 703 (footnote omitted).  Third, the court noted that "where the respondent causes or is otherwise responsible for the MDHR's delay in making the probable cause determination, the respondent is not prejudiced by the MDHR's delay." *Id.* at 703 n.8.

Invoking *Beaulieu*, CFMOTO asserts that because the MDHR did not make its final probable cause determination until thirty-seven months after Wilson filed his original charge, Lindsey's intervention in this proceeding would be *per se* prejudicial. But the Court rejects this argument, for three reasons.  First, CFMOTO fails to point out that the MDHR made an earlier probable cause determination on April 14, 2014, **only twenty-four months** after Wilson filed his original charge.  CFMOTO contested that determination, and it was vacated and remanded for additional investigation on March 20, 2015.  By contesting the initial determination, CFMOTO "cause[d] or [was] otherwise responsible for the MDHR's delay." *Id.* at 703 n.8.  As the *Beaulieu* court noted, an employer that causes or is responsible for the MDHR's delay in making the probable cause determination cannot later claim prejudice from that delay. *Id.*  Accordingly, excluding the appeal time, the MDHR's delay was actually only twenty-seven months, and not thirty-seven months.  A twenty-seven-month delay is not *per se* prejudicial and does not require dismissal of the complaint; instead, this Court may grant relief that is "in proportion to the prejudice suffered." *Id.* at 702-03; *see Acker v. Envtl. Res. Mgmt., Inc.*, 93 F. Supp. 3d 1060, 1064 (D. Minn. 2015) ("In this case, the bright-line rule does not

apply because the MDHR's probable cause determination was made fewer than 31 months after Plaintiff filed her charge."). Here, CFMOTO has not made **any** specific arguments regarding prejudice, and absent prejudice, the Court finds no basis to deny Lindsey's motion to intervene.

Alternatively, even assuming that the MDHR's delay exceeded thirty-one months, it is not clear that *Beaulieu* even applies to this case. In *Beaulieu*, the government sought to administratively prosecute the plaintiff before an administrative law judge based on a charge and probable cause determination. Here, however, Lindsey is seeking to intervene in a civil action brought by Wilson against another private party. This Court has previously held that *Beaulieu* does not apply to civil actions commenced by private parties.[9]

Moreover, the policies underlying *Beaulieu* are hardly supported by extending the thirty-one-month rule to this case. The Minnesota Supreme Court established this bright-line rule to ensure expeditious resolution of discrimination charges filed with the MDHR, *Beaulieu*, 552 N.W.2d at 702 ("[D]elays make resolution of discrimination charges more difficult: evidence and witnesses may disappear, memories may fade, assets may be

[9] *Montgomery v. Indep. Sch. Dist. No. 709*, 109 F. Supp. 2d 1081, 1101 (D. Minn. 2000) (distinguishing *Beaulieu* because the instant action involved "a claim filed in court by an individual plaintiff" and not "a charge prosecuted administratively by the MDHR itself"); *see also Chavira v. Crown Cork & Seal USA, Inc.*, No. 13-1734, 2015 WL 4920094, at *7 (D. Minn. Aug. 18, 2015) ("*Beaulieu* has no application in this case, which is a civil action brought by an individual plaintiff rather than a charge prosecuted by the MDHR"); *Acker v. Envtl. Res. Mgmt., Inc.*, 93 F. Supp. 3d 1060, 1064 (D. Minn. 2015) ("*Beaulieu* involved a charge prosecuted by the MDHR rather than a civil action filed by an individual plaintiff.").

wasted, and damages may continue to accrue."), and to prevent the MDHR from taking advantage of its own delay to the detriment of an employer, *see id.* (noting that "the MDHR's incentive to act expeditiously . . . [would be] greatly diminished" if there were no time limit for resolving discrimination charges). Here, where Lindsey seeks to intervene in a private civil action instead of instituting his own enforcement action, these concerns are not implicated. First, regardless of whether Lindsey is permitted to intervene, CFMOTO must still defend itself against Wilson's claims. This reduces, if not eliminates, any possible prejudice from Lindsey's intervention. Second, Lindsey has a strong independent motivation to intervene – to protect the MDHR's interests in administering the MHRA. Although the MDHR declined to initiate its own administrative action against CFMOTO, now that Wilson has filed this complaint, Lindsey understandably wants a seat at the table as the Court adjudicates important questions about the statute.

Finally, the MHRA explicitly allows the MDHR to intervene in private civil actions, including in cases where the plaintiff files the action directly in the district court without first pursuing administrative remedies. *See* Minn. Stat. § 363A.33, subdiv. 1 ("[A] person may bring a civil action seeking redress for an unfair discriminatory practice **directly** to district court." (emphasis added)); *id.* § 363A.33, subdiv. 5 ("[T]he court may permit the department to intervene in a civil action **brought pursuant to this section**." (emphasis added)). This implies that the MDHR's right of intervention is independent of the administrative framework and, therefore, not subject to *Beaulieu*. Indeed, there are only two statutory prerequisites for intervention, and both are unrelated to the probable-

cause-determination process: the motion must be "timely" and the MDHR's involvement must be "of general public importance." *Id.* § 363A.33, subdiv. 5. Here, as explained above, Lindsey's motion is timely – it comes less than three months after Wilson filed his amended complaint and discovery has not yet commenced. Furthermore, Lindsey has presented plausible arguments for why intervention is of general public importance: prevailing in the case will help eliminate racial discrimination in Minnesota, and the case involves important questions regarding the reach of the MHRA.

Overall, based on the foregoing, the Court will grant Lindsey's motion to intervene. Lindsey has satisfied Rule 24(b)(2)(A), his prospective complaint states a plausible claim for relief, and *Beaulieu* is not a bar to intervention.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant CFMOTO's motion to dismiss [Docket No. 7] is **DENIED**.

2. Commissioner Lindsey's motion to intervene [Docket No. 19] is **GRANTED**.

DATED: March 7, 2016
at Minneapolis, Minnesota.

s/ John R. Tunheim
JOHN R. TUNHEIM
Chief Judge
United States District Court